SOVEREIGN CAMP OF THE WOODMEN OF THE WORLD, A CORPORATION, *Plaintiff in Error*, v. MABEL W. HODGES, *Defendant in Error.*

Opinion Filed Dec. 12, 1916.

1. Allegations in the count of a declaration are said to be repugnant, when they contradict and neutralize each other in relation to matters of substance.

2. An allegation in a declaration upon a certificate of life insurance issued by a fraternal organization, which certificate is attached to the declaration and made a part of it by apt words, which is repugnant to a clause in the certificate of life insurance relating to a matter of substance will be considered bad on demurrer.

3. A clause in a certificate of life insurance issued by a fraternal organization, which provides in substance, that the insured shall participate in the beneficiary fund of the society to an amount of money stated should death occur during the second year of membership and that "payment of the certificate shall be based upon an assessment on the entire beneficiary membership of this order in good standing; the full amount when so paid in no case to exceed the amount of one such assessment, nor shall any portion so paid be in excess of a like proportion of a single assessment on the entire beneficiary membership at that time," etc., is not repugnant to and inconsistent with an allegation in the declaration that the holder of the certificate should participate in the beneficiary fund to a certain amount should his death occur within the second year of membership and the "defendant promised to pay to plaintiff the beneficiary named" in the certificate the certain sum so stated.

4. The performance of conditions precedent may be averred generally by either party in an action.

5. In a civil action upon a certificate of life insurance, where the defense was that the insured came to his death by suicide, the

burden of proof is upon the party averring the suicide, but need not be established to the satisfaction of the jury beyond a reasonable doubt, but the evidence of suicide should preponderate in support of that contention to meet the burden of proof.

6. Where in a civil case the evidence of suicide is entirely circumstantial and is not so complete in its probative value as to exclude an hypothesis inconsistent with the theory of death by suicide, a verdict against the party upon whom the burden of maintaining a plea of death by suicide rested, will not be disturbed as being contrary to the evidence.

7. Evidence examined and found sufficient to support the verdict.

Writ of Error to Circuit Court, Columbia County; M. F. Horne, Judge.

Judgment affirmed.

*Jos. A. Edmondson* and *W. C. Hodges,* for Plaintiff in Error;

*R. T. Boozer,* for Defendant in Error.

ELLIS, J.—Mabel W. Hodges sued the Sovereign Camp of the Woodmen of the World, upon a beneficiary certificate of life insurance which the defendant had issued to John G. Hodges, husband of the plaintiff.

The declaration alleged that John G. Hodges in February, 1913, being then a member in good standing of a subordinate lodge of the defendant made application for a "Beneficiary Certificate" of life insurance; that the defendant isssued the certificate and it was attached to and made a part of the declaration. It was alleged in the declaration that the certificate provided that "John G. Hodges should participate in its beneficiary fund to the amount of Two Thousand two hundred and fifty

dollars should his death occur during the second year of his membership and the further sum of one hundred dollars for the erection of a monument to his memory as provided in the constitution and laws of the defendant;" that while the certificate was in force and during the second year of John G. Hodges' membership, he died; that he had paid all dues and assessments levied or charged against him, and had fully complied with all the stipulations, conditions and provisions of the constitution and by-laws of the defendant and the contract of insurance on his part to be kept and performed; that the plaintiff was the wife of John G. Hodges at the time of his death, and is the only beneficiary under the certificate, and that to her and none other is payable the sums of money "which the defendant promised to pay upon the death of the said John G. Hodges as aforesaid;" that the defendant had been notified of the death of Hodges, the insured, and request made for the payment of the sums of money due to the plaintiff under the certificate.

The declaration contained a second count in which an additional sum was claimed as fees and compensation for the plaintiff's attorney in prosecuting the suit against the defendant. The second count however seems to have been abandoned by the plaintiff below.

The "Beneficiary Certificate" which was issued to "J. G. Hodges" in the sum of $3,000.00 and which was attached to the declaration and made a part of it, contains the following clause: "This Certificate issued by the Sovereign Camp of the Woodmen of the World by its authority, Witnesseth, That Sovereign John G. Hodges a member of Browning Camp No. 47 located at Live Oak, State of Florida, is, while in good standing as a member of this Fraternity, entitled to participate in its Beneficiary Fund to the amount of One thousand five hundred dollars

should his death occur during the first year of his membership, Two thousand two hundred and fifty dollars should his death occur during the second year of his membership, Three thousand dollars should his death occur after the second year of his membership, payable at his death to Mable W. Hodges bearing relation to him of wife by the Sovereign Camp of the Woodmen of the World." The Certificate also contained the following provisions: "Provided, that the payment of this certificate or any part thereof shall be based upon one assessment on the entire beneficiary membership of this order in good standing; the full amount when so paid in no case to exceed the amount of one such assessment, nor shall any portion so paid be in excess of a like proportion of a single assessment on the entire beneficiary membership at that time. There shall also be paid the sum of one hundred dollars for the erection of a monument to his memory as provided in the Constitution and Laws of the Order.

"This Certificate is issued and accepted subject to all of the conditions on the back hereof and this certificate together with the Articles of Incorporation, the Constitution and Laws of Sovereign Camp of the Woodmen of the World and the application for membership and medical examination shall constitute the contract between the Order and the member, and any changes, additions or amendments to the Articles of Incorporation, Constitution and Laws hereafter made or enacted shall bind the member herein named and his beneficiaries, and shall govern and control the contract in all respects the same as though such changes, additions or amendments had been made prior thereto and were in force at the time of his application for membership, also subject to the by-laws of the Camp of which he is a member."

One of the conditions upon which the certificate was issued and accepted was, that it should be null and void and of no effect in case the member holding the Certificate should die "by his own hand or act, whether sane or insane," etc.

The defendant below demurred to the declaration, the grounds of which are given in full, and are as follows:

"1.    The allegations, or statements, contained in the cause of action, which is made a part of plaintiff's declaration, are repugnant to and inconsistent with the allegations in the declaration.

"2.    The declaration alleges that the defendant promised to pay to the plaintiff the sum of Two Thousand Two Hundred and Fifty ($2,250.00) Dollars should the death of John G. Hodges mentioned and described in the said declaration, occur during the second year of his said membership; while the said cause of action provides that the said John G. Hodges is, while in good standing as a member of the Woodmen of the World, entitled to participate in its beneficiary fund to the amount of Two Thousand Two Hundred and Fifty ($2,250.00) Dollars, should his death occur during the second year of his membership, payable at his death to the plaintiff by the defendant.

"3.    Although the said cause of action contains a certain provision in the following words:    'This certificate is issued and accepted subject to all the conditions on the back hereof and this certificate together with the Articles of Incorporation, the Constitution and Laws of Sovereign Camp of the Woodmen of the World and the application for membership and medical examination shall constitute the contract between the Order and the member, and any changes, additions or amendments to the Articles of Incorporation, Constitution and Laws here-

after made or enacted shall bind the member herein named and his beneficiaries, and shall govern and control in all respects the same as though such changes, additions or amendments had been made prior thereto and were in force at the time of his application for membership, also subject to the by-laws of the Camp of which he is a member.' The said provision is not alleged in either count of the declaration.

"4.  The declaration does not allege that there is a sufficient amount of money in the beneficiary fund of the defendant with which to pay plaintiff's claim."

This demurrer was overruled, and such action of the court is assigned as constituting error.

The plaintiff in error, by its counsel, contends that the following allegation in the declaration, *viz.,* that the certificate provided that "John G. Hodges should participate in its beneficiary fund to the amount of two thousand two hundred and fifty dollars should his death occur during the second year of his membership and thereby the defendant promised it would pay to plaintiff, the beneficiary named therein, the said sum of two thousand two hundred and fifty dollars," etc., is repugnant to the clauses contained in the certificate which provide that: John G. Hodges "while in good standing as a member of this fraternity" is "entitled to participate in its beneficiary fund" to the amount of Two thousand two hundred and fifty dollars should his death occur during the second year of his membership, and that the payment of the Certificate "shall be based upon an assessment on the entire beneficiary membership of this order in good standing; the full amount when so paid in no case to exceed the amount of one such assessment; nor shall any portion so paid be in excess of a like proportion of a single assessment on the entire beneficiary membership at that time," etc.

It is apparent from a careful reading of the above clauses that when a certificate becomes due by reason of the death of the insured the amount to be paid is limited by the amount of one assessment on the entire beneficiary membership of the order in good standing; that is to say, if the full amount of the face of the certificate becomes due, the beneficiary will nevertheless not be entitled to receive a sum equal to the full face of the certificate unless one assessment on the entire beneficiary membership of the order in good standing would produce that sum, and if only a portion of the face of the certificate becomes due, no sum shall be paid greater than a sum equal to a like proportion of one such assessment. It is also apparent that the payment of the amount which may become due under the certificate is not made dependent upon the collection of any assessment made for the purpose of paying the particular certificate. The insured, by the terms of the Certificate, participates in the Beneficiary Fund to the amount named, which becomes payable to the Beneficiary named in the certificate, by the Sovereign Camp of the Woodmen of the World, upon the death of the insured; provided that the payment of the certificate shall be based upon one assessment and shall in no case exceed the amount of one assessment. The contract assumes that a fund called the Beneficiary Fund has been created by the Fraternal Order from which, upon the death of a member and holder of a certificate who has complied with the requirements of the Order, shall be paid a certain sum to the beneficiary named in the Certificate. We do not consider these clauses in the Certificate inconsistent with and repugnant to the idea of indebtedness accruing against the defendant upon the death of a holder of one

of the certificates who has complied with the require-
ments of the Order.   The promise to pay upon the hap-
pening of the contingency named is certain, it was not
contingent upon the creation of a fund from which to
make payment, the fund was in existence at the time the
Certificate was issued and was not to be created by an
assessment and collection, and the obligation to pay ac-
crued upon the death of the holder of the certificate; the
amount to be paid however may be reduced by a reduc-
tion in the beneficiary membership of the order to the
point where one assessment or portion of one assess-
ment would not produce an amount equal to the sum
named in the Certificate.

A count in a declaration is held bad for repugnance
when it contains allegations in relation to matters of
substance which neutralize each other, in which case
the count would fail to state a cause of action.   Jack-
sonville, T. & K. W. Ry. Co. v. Thompson, 34 Fla. 346,
16 South. Rep. 282; Hoopes v. Crane, 56 Fla. 395. 47
South. Rep. 992; Florida Cent. & P. R. Co. v. Ashmore,
43 Fla. 272, 32 South. Rep. 832; State v. Seaboard Air
Line Ry., 56 Fla. 670, 47 South. Rep. 986.   The last
case was one in which it was held that the rule would
apply where statements in a cause of action attached to
and by apt words made a part of the declaration, are
repugnant to and inconsistent with the allegations in the
declaration.

The position taken by counsel for plaintiff in error as
to the effect of repugnancy in a declaration is undeni-
ably settled by a long line of decisions by this court.
The only question therefore on this point is whether the
provisions referred to in the Certificate are inconsist-
ent and repugnant to the allegations in the declarations.

The case of Ring v. United States Life & Accident

Ass'n, 33 Ill. App. 168, cited by counsel for plaintiff in error holds that where the contract is not one to make an assessment and pay over the proceeds, nor does not provide that an assessment shall be specially levied to pay a loss on any particular certificate, but names a sum to be paid upon the death of the insured, the promise is absolute. The court said the scheme was to create and keep up a general fund, out of which losses shall be paid as they occur. The case of Kansas Protective Union v. Whitt, 36 Kan. 760, 14 Pac. Rep. 275, holds that where the promise to pay a certain sum is made, coupled with the qualification that the amount to be paid "is conditioned upon assessments made therefor and shall in no case exceed seventy-five per centum of the amount received thereon," the burden was upon the company to show the amount realized or collected and not on the plaintiff. To the like effect is the case of Metropolitan Safety Fund Accident Ass'n v. Windover, 137 Ill. 417, 27 N. E. Rep. 538, which holds that a proviso that if the amount realized from one full assessment is insufficient to pay the amount of indemnity named in the Certificate, then the beneficiary shall accept the amount realized in full of her claim, is a mere exception or condition that under certain circumstances which may or may not arise, the beneficiary shall accept in discharge of the defendant's obligation a sum less than that agreed to be paid to her, and that the burden of establishing these reductions was on the defendant. That case distinguishes between those contracts in which a certain sum is promised to be paid the beneficiary subject to the condition that the beneficiary will accept the amount of one assessment in settlement of the claim if the assessment should be insufficient to pay the face of the Certificate, and those in which it is agreed that upon the death of a member an

assessment upon the surviving members will be made
for the purpose of paying the indemnity and that the
sum collected shall be paid to the beneficiary. The
declaration in this case is upon the absolute promise to
pay the specific sum agreed to be paid upon the death of
the member, the condition which if it exists at all that
will reduce the amount agreed to be paid, depends upon
the number of beneficiary members of the order in good
standing. This fact may be ascertained from the books
of the corporation which are in the possession and cus-
tody presumably of its officers, and should be set up by
plea and sustained by proof to defeat the case made for
the plaintiff on her declaration. See Elkhart Mut. Aid
B. & R. Ass'n v. Houghton, 103 Ind. 286, 2 N. E. Rep.
763; May on Insurance, § 563a; O'Brien v. Home Ben.
Soc., 117 N. Y. 310, 22 N. E. Rep. 954; Supreme Lodge,
Knights of Pythias v. Knight, 117 Ind. 489, 20 N. E.
Rep. 479; Leuder v. Hartford Life & Annuity Ins. Co.,
12 Fed. Rep. 465.

We think the allegations of the declaration that John
G. Hodges at the date of his death "had paid all dues and
assessments levied or charged against him during his
lifetime and that he had fully complied with all the stip-
ulations, conditions and provisions of the Constitution
and by-laws of the said defendant and the said contract
of insurance on his part to be kept and performed," are
sufficient under our statute permitting the averment, by
either party in an action, of performance of conditions
precedent generally. Sec. 1436 Gen. Stats. of 1906,
Florida Compiled Laws 1914; Tillis v. Liverpool & L.
& G. Ins. Co., 46 Fla. 268, 35 South. Rep. 171, 110 Am.
St. Rep. 89; Supreme Lodge K. of P. v. Lipscomb, 50
Fla. 406, 39 South Rep. 637. This point however was

not raised, by the demurrer although it was argued in the brief of counsel for plaintiff in error. The third ground of the demurrer is not argued. The Certificate was attached to and made a part of the declaration by appropriate words, it was unnecessary to allege in each count of the declaration every statement or condition named in the Certificate. If the provisions referred to were conditions precedent, performance of them was averred in the language above quoted; if they were conditions subsequent or matters of defense, it was unnecessary to anticipate such defense by denying failure to perform the acts required.

The defendant below interposed three pleas to the declaration. The first two presented the issue that the deceased member, John G. Hodges, came to his death by his own hand, or his own act. The third plea merely denied, that the defendant had refused to pay a hundred dollars for a monument to the memory of the deceased. No point is made on this plea, however, it seems not to have been considered by either party in the case.

Issue was joined upon the pleas and the case went to trial which resulted in a verdict for the plaintiff. A motion was submitted in behalf of the defendant to set aside the verdict and, grant a new trial upon the ground that the verdict was contrary to the evidence and the law. This motion was overruled and such ruling is assigned as error. The bill of exceptions according to the certificate of the Circuit Judge who tried the case contains all the evidence introduced at the trial. Whether John G. Hodges committed suicide was the question presented, by the first and second pleas and that the burden was upon the defendant to establish that fact is conceded by counsel for both plaintiff and defendant. What measure or degree of proof is necessary to legally establish

the fact, where the evidence relied upon is circumstantial, so that a verdict against the defendant should be set aside as being clearly contrary to the evidence?

In the case of Schultz v. Pacific Insurance Co., 14 Fla. 73, where an action was brought to recover the amount of an insurance policy upon the freight of a barque on a voyage from Pensacola to England, there was a plea that the vessel was designedly cast away. The trial court charged the jury on that point as follows: "In determining this question you must be satisfied beyond a reasonable doubt that the Master did designedly cast the vessel away before you can find against him on this point." Mr. Justice WESTCOTT who delivered the opinion of this court said, in sustaining the charge: "The decisions upon the precise point, therefore establish the rule to be, that the character of the fact to be proved. and not the position of the party determines the degree of proof to be required." The reason upon which he based the rule was that the act charged was a crime, and the fact to be proved whether its proof be in a civil or criminal case is the same and the same amount of proof which exists in one case must exist in the other. The Schultz case was followed in Williams v. Dickenson, 28 Fla. 90, 9 South. Rep. 847. In that case Dickenson sued Williams in an action of trespass for procuring another to burn the former's gin house. The trial court charged the jury that in determining the issues they were not to be governed by the rule which obtains in criminal cases, viz, that they must be satisfied beyond a reasonable doubt that the defendant did the things complained of, but they should find for the plaintiff if they believed from a "preponderance of the weight of the evidence" that the defendant did the things complained of. This court through Mr. Justice TAYLOR, said: "Were the

propositions of law involved in this charge presented to us for the first time as an original proposition, we would be strongly inclined to uphold the charge as a correct enunciation of the law, for which there is an abundance of weighty authority." But the charge was held to be erroneous upon the authority of the Schultz case. The rule announced in the Schultz case however was definitely overruled in the case of Abraham v. Baldwin, 52 Fla. 151, 42 South. Rep. 591. So that although love of life may be strong in mankind and self-destruction be regarded as in the nature of a criminal act, and the burden of proof rests upon the party asserting suicide, it may be regarded as settled by this court that such defense in a case of this character need not be established to the satisfaction of the jury beyond a reasonable doubt in order that it may prevail, but that to maintain it the evidence should preponderate in favor of that contention. In this case, however, the evidence relied upon by the defendant to establish the defense was circumstantial, and while no presumption of law existed against the suicide of Mr. Hodges, the burden of proving his self-destruction rested upon the defendant to be decided by the jury as an inference of fact in the same manner as other facts are determined in civil cases. Modern Woodmen of America v. Craiger, 175 Ind. 30, 92 N. E. Rep. 113; 93 N. E. Rep. 209; Brown v. Sun Life Ins. Co., Tenn. , 51 L. R. A. 252; Knights of Pythias v. Steele, 107 Tenn. 1, 63 S. W. Rep. 1126; Mutual Life Ins. Co. of New York v Wiswell, 56 Kan. 765, 44 Pac. Rep. 996, 35 L. R. A. 258; 4 Wigmore on Evidence, § 2498.

The value of circumstantial evidence consists in the conclusive nature and **tendency of the circumstances** relied upon to establish any controverted fact. This lan-

guage of Mr. Justice MABRY in the case of Whetston v. State, 31 Fla. 240, 12 South. Rep. 661, received the unanimous approval of this court as then constituted, and the case has several times been cited with approval by this court. Gantling v. State, 40 Fla. 237, 23 South. Rep. 857; Jenkins v. State, 35 Fla. 737, 18 South. Rep. 182. In the Whetston case the court quoted from Mr. Starkie in his work on Evidence, as follows: "Such evidence is always insufficient, where assuming all to be proved which the evidence tends to prove, some other hypothesis may still be true; for it is the actual exclusion of every other hypothesis which invests mere circumstances with the force of proof. Whenever therefore the evidence leaves it indifferent which of several hypotheses is true, or merely establishes some finite probability in favor of one hypothesis rather than another, such evidence cannot amount to proof, however great the probability may be." Mr. Justice TAYLOR speaking for the court in Kennedy v. State, 31 Fla. 428, 12 South. Rep. 858, said: "1st. That the circumstances from which the conclusion is drawn should be fully established. 2nd. That all the facts should be consistent with the hypothesis. 3rd. That the circumstances should be of a conclusive nature and tendency, and, 4th, That the circumstances should to a moral certainty actually exclude every hypothesis but the one proposed to be proved. This measure of the value of circumstantial evidence applies alike to civil and criminal cases. Tested by these rules the jury in this case concluded that the evidence was insufficient to establish the defense of suicide. The question here is not whether there was evidence to support the verdict, because in the absence of any evidence as to suicide the plaintiff below would have been entitled to a verdict; but rather can this court say, after

due weight given to all the evidence the verdict cannot be right? or in the opinion of Judge MORRIS in the case of Modern Woodmen of America v. Kincheloe, 175 Ind. 563, 94 N. E. Rep. 228, "Does the record disclose any fact inconsistent with the conclusion of death by suicide?"

The evidence shows that Mr. Hodges, on September 18, 1914, was employed in the Express Office at Live Oak; he had a wife and one or more children who were on a visit to the wife's parents at Lake City. On that day Mr. Hodges was confined to his room on account of sickness. During the day he was visited by one or more friends or acquaintances, to one of whom he gave a sum of money with the request that it be sent to his wife at Lake City. There was no evidence to show unhappy relations with his family, nor that he was mentally depressed, nor physically ill to any serious degree, nor financially embarrassed. There was nothing to show any fear of social or business disgrace, nor that he contemplated self-destruction as a means of escape from impending embarrassment of any character. He was last seen alive in his bedroom at about three or four o'clock in the afternoon by one who called to enquire as to his friend's health. On the morning of September 19th, the day following, at about 8 o'clock, a man who with his wife occupied apartments across the hall in the same building, after having answered a telephone call for Mr. Hodges, went to his door leading from the hall into his room for the purpose of calling him, finding the door locked he elevated himself to the level of the transom over the door by means of a chair, and, looking through the transom, discovered Mr. Hodges lying upon his bed dead. The man who made this discovery summoned others to his assistance and upon their arrival,

they effected an entrance into the room through a door which opened from a passageway leading into an adjoining room. That door was fastened by means of a latch on the inside which would catch and fasten the door when closed by any one leaving the room. The dead body of Mr. Hodges was found lying on its back at full length upon the bed—diagonally across it, with his feet toward the door leading into the hall. The right foot was hanging over the side of the bed and the left foot resting on the bed. There were two wounds in the head, one on the left temple and the other just above the right ear. The latter wound was the smaller of the two; the body was clad in undershirt and drawers only, in the right hand was a shattered hand mirror and on the floor a few inches from the bed and lying between the right foot and the door leading into the hall they found a pistol containing one empty shell and several loaded shells. The bullet in one of the loaded shells had been trimmed or cut away to a sharp point. On a rug near the bed there was a blood stain about twelve or sixteen inches from the edge of the rug, the stain was about twelve inches long and about six or seven inches wide. This stain was discovered by the wife of the deceased and according to her testimony was not on the rug when she left home a week before. The windows to the room were screened and closed and fastened from the inside. On the wall of the room opposite the door to the hall, and about seven feet from the floor was an "indentation" according to one witness, "a bullet hole" according to another. A bullet was embedded in the hole and fell to the floor after several persons had come into the room. Another bullet was found under the bed. The condition of the bullets, their sizes and shapes, were not shown. There was blood on the bed near the head of the de-

ceased and a good deal under him. His clothes were saturated with blood and when his body was found he had evidently been dead several hours. There were splotches of blood on his leg, his "underwear which was short" was saturated, "perfectly stiff, and just a few splotches all down to his feet—on his feet." There was some evidence that the two wounds were about the same size. Mr. S. Pottsdammer, however, who was Sheriff of Suwannee County testified that he examined the wounds in Mr. Hodges' head very carefully; that he found no powder burns or smoke marks on the wound. Mr. Pottsdammer was also an undertaker, and, judging from an unfinished sentence in his testimony as written, prepared the body for burial. He said that "the hole on the left side was larger than on the top of the head, the flesh around this wound looked like it was torn up" and, "From my observation and experience with pistol wounds in the human body I would say that the place on the left hand side of the forehead was where the bullet *came out,* * * because the other hole on the top of his head was the smallest hole. My experience is that where the bullet comes out it makes the biggest hole." On cross-examination he said that he washed the temple "it was very bloody" and if there were powder marks at the wound on the temple they were covered with blood which he washed off "and in doing so, of course washed the powder mark off." Continuing he said "The hole in the temple was more torn, the other hole on the top of his head seemed to be a smaller hole. I didn't discover it at first at all until after I washed his head. I couldn't say how much larger it was, but the hole at the temple was torn, ragged hole and at the 'tip' of his head, was a clean, sharp cut hole." Several physicians testified that from their observation and experience and investigation

of such wounds, they would say that the wound at the entrance of the bullet would be smaller than at the exit; and one said that where the ball made its exit the "flesh would generally be everted." This condition existed as to the wound on the left temple, according to the witness Pottsdammer. Another physician said "the bullet at its exit tends to tear the tissue more" and that there is quite a difference in the appearance of the wound "at exit and entrance." Mr. Goggins said as to the wound in the left temple it was "a bullet hole of considerable size." Dr. H. A. P. Julian said: "I think a pistol held anywhere within 12 inches of the human body would make a powder burn on the skin." And "If the muzzle of the pistol was held closely against the head there would be powder marks." Mr. J. G. Roberts, who has been a police officer for eight or ten years said that "From my experience and observation I would say that the entrance hole of a bullet in the human body is always smaller than the exit hole. My experience in regard to powder burns or marks around the wounds has been that the closer the weapon is held, why the more powder there is. The pistol would have to be something like three or four feet from the body not to leave powder burns or marks," etc. There was no evidence as to powder marks on the left temple, nor cauterization of the flesh near the wound, nor in the walls of the wound. There was no evidence as to ownership of the pistol, its calibre, nor the calibre of the bullets found in the room. There was evidence tending to establish the fact that from 5 o'clock p. m. on the 18th day of September until about 11 o'clock p. m. there was no light in Mr. Hodges' room. Mr. Sid Hinely who lived next door to Mr. Hodges and about 150 feet away, heard a pistol shot in the direction of Mr. Hodges' apartments about 11 o'clock p. m. that

night. There was evidence to show that the deceased was "left handed."

The theory of the defense seems to have been, that Mr. Hodges committed the act of self-destruction by firing the bullet into his own brain and to accomplish this, he sat on the edge of the bed near the hall door, and looking into a hand mirror which he held in his right hand to enable him to see the exact spot on his head at which to place the pistol, fired the weapon into his left temple. If this theory is true then the shot must have been fired between 3:30 or 5 o'clock p. m. September 18th, and 6 o'clock p. m. of the same day. Because at the former hour I. K. Watson and W. B. Lewis, who lived in the same house with Hodges were with him and at 4 or 5 o'clock p. m., Frank Weiss was with him, and at about the last named hour, 6 o'clock p. m., Mr. Lewis and his wife returned home, turned on the lights on entering the house and noticed that there was no light in Mr. Hodges' room. We think, however, that the jury was fully justified in believing from the evidence that the bullet which killed Mr. Hodges entered his head on the right side just above the right ear and came out at the left temple, and was fired at about 11 o'clock p. m., and was the pistol shot heard by Mr. Hineley at that hour. If those facts are true they are utterly inconsistent with any reasonable conclusion of death by suicide. It is reasonable to say that if Mr. Hodges fired the shot, he fell immediately where he was sitting; that was on his bed. Lying where he fell how could his feet have become splotched with blood? How is the blood stain on the carpet accounted for? Why were there no powder stains nor cauterization of the wound in the left temple? Why was that wound larger than the other, and the tissue torn and everted? While the wound on the

right side of the head was "clean sharp cut?" Why was it not shown that the pistol was owned by Mr. Hodges or borrowed from some one by him? Why was not the bullet which was found sticking in the wall shown to have been mashed or flattened or in a condition showing that it had passed through some living flesh and come in contact with the wall which stopped its flight? If a bullet was found near Mr. Hodges' feet and another near the wall, which according to the testimony of J. C. Knowles and G. Pottsdammer was the fact, the significance of the one in the wall is considerably weakened, if not wholly destroyed. If the pistol shot which Mr. Hineley heard at 11 o'clock p. m. was the one which killed Mr. Hodges, there was no need for a hand mirror as the room must have been very dark and he could not have seen the reflection of his own face in the mirror. A door to the bedroom which opened into a passage way between that room and another was furnished with a lock or latch which could be opened from the outside and made to fasten on the inside by closing it on one leaving the room.

We have discussed the evidence at some length and devoted to it more time and space than the case perhaps required, but we did so because of the undeniably strong probability which the evidence on first reading raises that the deceased destroyed his own life, yet when carefully considered, is found to contain facts which are clearly established, at least which the jury were fully justified in believing to be true, and which are seen at once to be irreconcilably in conflict and utterly inconsistent with the theory of self-destruction. So the jury believed and found accordingly, and there is no authority in law nor precedent for disturbing their verdict.

The judgment of the court below is, therefore, affirmed.

TAYLOR, C. J., and SHACKLEFORD, COCKRELL and WHITFIELD, JJ., concur.