TERRELL, Justice
(dissenting).
World Insurance Company and Security Life and Trust Company each issued a policy of insurance on the life of Ernest A. Stuckey, who is alleged to have died December 13, 1957, as the result of a gunshot wound in the head. Wanda J. Stuckey, the wife of Ernest Stuckey, was the beneficiary in both said policies. After the death of Stuckey, she transferred her interest in the policies to Danny and David Stuckey, minor sons of hers, the product of her marriage with Stuckey. She married Kincaid, qualified as guardian for Danny and David Stuckey and brought these suits in their behalf. The suits were consolidated for trial and for the purpose of review.
In the suit against World Insurance Company the complaint alleges that defendant agreed to pay the face amount of the policy upon the death of insured from accidental bodily injuries, that the insured met his death by accidental means when the policy had been in force less than five months prior to death of insured, and that defendant had failed to pay said insurance. By its answer defendant denied that any sum was owed on the policy, and for affirmative defenses defendant alleged (1) that plaintiff failed to give written notice of the claim as required by the policy, with the result that defendant had become prejudiced and handicapped in making inquiry into and investigating the events surrounding the death of the insured, and (2) that under the terms of the policy the benefits were payable only if death of the insured resulted “directly and independently of all other causes from accidental bodily injuries,” and that Stuckey committed suicide.
The Security Life and Trust Company policy, issued less than two years prior to the death of insured, contains the following provision:
“Self-Destruction. — Self-destruction on the part of the Insured, whether sane or insane, within two years from the date of this policy is a risk not assumed by the Company under this contract, and the extent of recovery hereunder shall be the premiums actually paid by the insured.”
The complaint against Security Life and Trust Company, hereinafter referred to as Security, alleges that the face amount of the policy ($2,500) became payable upon the death of the insured, and that certain other benefits; under “Mortgage Redemption Monthly Decreasing Term Provision,” became payable on the death of the insured; that all amounts payable under the policy had matured and became due and payable, but that Security had failed and refused to pay the same. The answer of Security denied that any sum of money was due and payable under the policy and for an affirmative defense charged that the insured died by self-destruction within less than two years from the date of issuance of said policy, thus excluding recovery thereunder.
The jury returned a verdict for the plaintiff as to each policy. Defendants’ motions for a new trial and for judgment notwithstanding the verdict as to each policy were denied. The District Court of Appeal, First District, reversed the trial court with directions to enter judgment non obstante veredicto for defendants on the ground that the “overwhelming weight of the competent material evidence in the cases on appeal, taken as a whole, affords no basis for any conclusion other than that the insured committed suicide.” (See 145 So.2d 268, 277.) We are confronted with *520 an appeal by certiorari from the judgment of the district court of appeal.
To support the jurisdiction of this court petitioner relies on Mutual Life Insurance Co. v. Bell, 147 Fla. 734, 3 So.2d 487; New York Life Insurance Co. v. Satcher, 152 Fla. 411, 12 So.2d 108, and Mutual Life Insurance Co. v. Johnson, 122 Fla. 567, 166 So. 442.
As to Mutual Life Insurance Co. v. Bell and New York Life Insurance Co. v. Satcher, supra, we do not find the elements of direct conflict.
Mutual Life Insurance Co. v. Johnson, supra, was a suit on the double indemnity feature of a policy. The face value had been paid and defendant alleged that Johnson had committed suicide. Johnson was a police officer and had not been pestered by financial troubles or domestic cyclones; he was right-handed and was experienced with firearms. He had been handling his pistol during the evening before his death; there were powder burns on his head and the circumstances indicated that the gun was held in his right hand when he was shot.
This case factually and on the law appears to be in direct conflict with the district court’s opinion in the case at bar and would confer jurisdiction on this court.
The facts out of which the instant cases grew are substantially as follows: The body of Ernest A. Stuckey was found in a bedroom in his home early on December 13, 1957. His .32 caliber revolver was near his body. There was no evidence of a struggle. He had been recently killed by a bullet which entered his head at or near his right temple, ranging diagonally into his head. The gun had two empty shells, a bullet hole was located in the ceiling of the room in which the body was found and there was a chip in the terrazza floor caused by a pistol bullet. There were no powder burns around or near the fatal wound or on the body of deceased. The wound, orifice was oblong, not round. The path of the bullet was angled from the rear to the facial area and the .32 caliber bullet was lodged close to the surface of the wound orifice and the wound was of extremely shallow penetration.
The death gun was subsequently test-fired using identical .32 caliber ammunition. The tests reflected that powder burns and tattooing were clearly evident on the target up to a distance of 18 inches from the muzzle of the death gun to the target; the gun was not defective in that each shot fired into the target produced a round hole in the target, not oblong as was the fatal wound.
The special investigator from the office of the state attorney testified that he had examined the body, probed the wound, and test-fired the death gun. He concluded that because there were no powder burns around or near the fatal wound 'or on the body of the deceased, the muzzle of the gun must have been more than 18 inches from the wound orifice; that the oblong wound orifice was an indication of a tumbling bullet that would necessarily be caused by a ricocheting shot; the angle of the wound indicated that the deceased would have to have been standing on his head to inflict such a wound at that angle, and that the fact that the bullet was lodged so close to the surface of the wound orifice indicated that the bullet was virtually spent before its entry into the head of the deceased. Said investigator was asked the question “do you have an opinion as to whether or not Ernie Stuckey committed suicide,” and answered:
“A. It is my opinion, Mr. Becks, that Ernest Stuckey did not commit suicide. Ernest Stuckey was shot in the head by this ricocheting bullet, off the terrazzo floor. I determined, not only from the type of wound, but the fact that there wasn’t any powder burns on his head, but also the fact that the trajectory of the bullet indicates that a man would have to be standing on his *521 head to he shot the way he was. That is my opinion.”
At the time of his death Stuckey was alone in his room. He was in normal health in body and mind; he had no financial worries, domestic problems or feuds with his neighbors, though he and his wife were estranged in that they resided at different addresses, but in all other respects lived as man and wife. He was a happy-go-lucky fellow who loved life and who, minutes before his death, was engaged in horseplay with a friend whom he had known casually about two years. On the afternoon preceding his death, he made plans for the following day to cut a Christmas tree for his wife and two children. He was to be accompanied by a cousin, a police officer and lifelong friend. It was hunting season and they were going into the woods to select a Christmas tree. On the same afternoon, the day preceding the accident, he and his wife wrapped Christmas packages together.
On the evening of December 12, 1957, Stuckey went to the Moose Club where he had a drink and then proceeded to a night club, Glen’s Hi Lo in Ormond Beach, where he had two or three drinks. Mrs. Stuckey, in the company of two married couples, residing next door to the Stuckey family residence, went to the Derby Bar for a drink. One of the married couples went home and Mrs. Stuckey accompanied by her neighbor, Mrs. White, went to Glen’s Hi Lo Club. Mr. and Mrs. Stuckey were at Glen’s Hi Lo Club at the same time though there is no indication that they spoke with one another. Mrs. Stuckey did not see her husband alive after that.
Shortly before his death Stuckey went to tlie True-Vue Grill Restaurant about two o’clock A.M., December 13, 1957, where he met Jack Lynady, deputy sheriff, and special investigator for the state attorney. Stuckey teased Lynady whom he had known for some time and told him [Lynady] about seeing his wife at the Hi Lo Club but was not in the least upset about seeing her. Stuckey and Lynady separated and Stuckey proceeded to the family home on Colfax Avenue and shortly thereafter was found in the bedroom of the family home dead, with a bullet wound in the right temple.
A death certificate was duly issued, showing that death occurred at 2:30 o’clock A.M. on December 13, 1957, and that the deceased was buried on December 16, 1957. No coroner’s jury was empanelled to determine the cause of death, but the certificate showed “suicide by self-inflicted gunshot wound.” (The district court of appeal refers to the Coroner J. C. Beard as a brother of Mr. Stuckey’s widow but there is no consanguinity between any of the parties involved and Mr. Beard.) Subsequent to the filing of this death certificate (about one year after), a coroner’s jury was summoned and after hearing the testimony and viewing the evidence, the jury rendered a verdict of accidental death. The original death certificate filed in Jacksonville, Florida, was corrected to show the finding of the coroner’s jury. Said death certificate, together with the coroner’s affidavit, was admitted in evidence.
The petition for certiorari herein is accompanied by a “Certified Transcript of that portion of the record of the proceedings as petitioner deems necessary to show jurisdiction in the Supreme Court and establish facts relied upon by petitioner. It is further accompanied by a certified copy of the decision petitioner seeks to have reviewed and a supporting brief.”
Respondents say that the “facts of this case and the principles of law involved, are so clearly set forth in the unanimous opinion of the District Court of Appeal, First District, reported in 145 So.2d 268, that we respectfully incorporate Judge Sturgis’ opinion as a portion of this Brief in Opposition to the Petition for Certiorari.”
The gist of respondents’ contention is that in absence of direct conflict between the district court’s opinion in the case at bar and this court’s opinion in the Bell case, *522 supra, there is no g-round for exercise of this court’s jurisdiction. Respondents assert their position is fortified by Anderson v. New York Life Insurance Co., 140 Fla. 198, 191 So. 307; Seaboard Air Line R. Co. v. Branham, Fla.1958, 104 So.2d 356; Ansin v. Thurston, Fla.1958, 101 So.2d 808, and Hastings v. Osius, Fla.1958, 104 So.2d 21. This contention is answered by the fact that we fasten jurisdiction on conflict between this court’s opinion in Mutual Life Insurance Co. v. Johnson, supra, and the district court’s opinion in the case at bar.
It would aid materially in solution of the questions presented to bear in mind that this is in reality two lawsuits consolidated at the trial level, each involving distinct and severable problems. In the World Insurance Co. case petitioner carries a heavier burden of proof since her policy is payable only in the event of accidental death of Ernest Stuckey. This she must prove to recover. In the Security case, as to the face of the policy and the mortgage redemption features, when petitioner establishes a prima facie case of accidental death, the burden shifts to the insurance company to establish its affirmative defense that the insured met death by suicide.
This is a somewhat lengthy recital of the facts out of which this case grew, but we have considered this necessary because when it is determined whether Stuckey came to his death by suicide or by some accidental agency, we will have gone a long way to answer the questions and unravel the mystery of the case. Unravelling the mystery of the case is not the court’s but the jury’s function and no court has the right to substitute its “ipse dixit” for the jury’s finding when well grounded. These mystery cases have become so common of late that enforcement officers now frequently classify them as “crazy-quilt patterns of death and tragedy.”
Now let us revert to the fact that in the circuit court the jury returned a verdict for the plaintiff on both policies on which the court entered judgment in petitioner’s favor which the district court of appeal reversed.
To reach its conclusion the jury was required to resolve the elaborate factual display in the forepart of this opinion; then there were other factual considerations that prompted the jury’s conclusion: The witness Lynady testified positively that in his opinion Stuckey did not commit suicide and gave plausible reasons for his opinion. The court pronounced him a competent witness.
Mrs. Kincaid, the petitioner in both cases, testified that during the five or six months she and Stuckey were estranged, he paid her $100 per week to run the house and that his plans for the future were to sell his business [electrical contractor] and go to work at Cape Canaveral.
In addition to the foregoing considerations, there were the physical facts which negative death by suicide and support death by accident. These physical facts had to do with (1) the absence of powder burns around the wound; (2) physical evidence as to the death gun producing powder burns; (3) oblong orifice, cause and conclusion; (4) bullet holes in the target by the death gun were round and not oblong as was the fatal wound; (5) angle of the wound and position it would have required of deceased to have been in to fire the gun; (6) the fact that the .32 caliber bullet was lodged so close to the surface of the orifice that it was necessarily about spent before entering the head of deceased.
The deceased was in normal health in body and mind, had no financial worries but was looking forward to the Christmas season. In fact, in all personal affairs everything pointed to the future; nothing in Stuckey’s behavior was consistent with suicide. These and the long list of physical considerations detailed herein were before the jury and entered into its verdict.
On consideration of such an array of physical facts and verbal testimony that was properly before the jury and the trial court, we are unable to understand how the *523 district court of appeal reached the conclusion that “the overwhelming weight of the competent material evidence in the cases on appeal, taken as a whole, affords no basis for any conclusion other than that the insured committed suicide.”
The presumption against suicide stands only until overcome by evidence sufficient to outweigh it. A multitude of considerations enter into this determination, such as the presence or absence of motive, physical facts surrounding the death, place where the body was found, its position, the presence or absence of powder marks when death was caused by firearms, the habits and temperament of the insured, his domestic and social environment, as well as pecuniary circumstances.
We understand the rule to be that when this court acquires jurisdiction of a cause like this it may treat and correct any error committed by the district court of appeal. It is also our understanding that the sole province of the jury is to determine the issues of fact and that its verdict will not be permitted to stand when based on illegal testimony or testimony that is contrary to natural law, or clearly inconsistent with the circumstances of the case. As to the questions of fact, the court cannot substitute its judgment for that of the jury.
We think that is what the district court of appeal did in this case. In finding that the “overwhelming weight of the competent material evidence in the cases on appeal, taken as a whole, affords no basis for any conclusion other than that the insured committed suicide,” we think the district court of appeal committed error. The jury and the trial court did not so find and we think there was ample competent evidence to support their finding. As we have so frequently said, they had the witnesses before them, heard them testify and were in much better position to evaluate the probative value of the evidence than we are.
In Mutual Life Insurance Co. v. Johnson, supra, we had much to say about the presumption of law against suicide. It is settled in this state that the presumption against suicide is a rule of law and not a rule of evidence. The presumption against suicide is rebuttable and gives way when, the physical facts and circumstances are wholly inconsistent with any theory or hypothesis of death by accidental means. In this case the evidence was circumstantial; there was no eyewitness to the tragedy; the evidence was not in all respects clear; some aspects of it were in conflict; some aspects of it may be said to be consistent with suicide, but we think the decided weight of it was more consistent with death by accidental means. We think the verdict is one that could have readily been reached by a jury of prudent men and should not be overthrown.
Mutual Life Insurance Co. v. Johnson, supra, is about as near parallel in fact 'and governing law as cases generally occur. Most of the questions in this case could be resolved on tire doctrine of the Johnson case. We do not overlook the fact that a different rule controls jurisdiction now from that which determined it when the Johnson case was brought here, but the controlling principles of law are no different.
In the Johnson case we said that where the evidence is circumstantial, not altogether clear, and as to some facts in hopeless conflict, if the verdict of the jury, as based on such evidence, is one that reasonably prudent men could have reached and is consistent with death by accidental means, it will not be overthrown if supported by a preponderance of the evidence as resolved by the jury, even if there is some evidence consistent with suicide. Sovereign Camp W. O. W. v. Hodges, 72 Fla. 467, 73 So. 347.
We also approved the doctrine in the Johnson case that in cases where the evidence in support of death by accidental means or suicide is so nearly balanced as to leave the question in doubt, the presumption in favor of the theory against suicide will tip the scales in favor of accidental death.
*524 Concluding its review of the pertinent facts in the Johnson case, which were as nearly parallel with the facts in the case at bar as cases ever are, the court said, “They might have been construed as supporting suicide, but the jury resolved the evidence on this point in the negative and they were well within the record in doing so.”
Many facts in this case negative suicide. Some facts and probabilities may be said to indicate suicide but, as we said in the Johnson case, the jury resolved the evidence ■on this point against respondents and they were well within the record in doing so. The district court of appeal had another view of the probative value of the evidence and reversed the trial court. We think they invaded the province of the jury when they did so.
There is another facet of this case that may give some of the justices concern; no transcript of the record has been brought to this court. It appears that on May 8, 1963, Mr. Chief Justice Roberts denied respondents’ motion to bring up the entire record. Neither petitioner nor respondents challenged the order of the Chief Justice in denying the motion of respondent to bring up the entire record. Under Rule 3.7(i), F.A.R., 31 F.S.A., points not raised and argued in the briefs will be considered as abandoned.
It further appears that the coroner’s verdict was admitted as evidence at the trial of this case. Whether or not this was harmless error it may not be possible to tell without the full record. Harmless error is defined in 2 Fla.Jur., Appeals, §§ 358 and 359.
Account of this situation some of the justices may think the case should be returned to the circuit court for a new trial in view of the fact that the affidavit of Coroner Beard relating to the cause of Stuckey’s death was a part of the death certificate offered in evidence by petitioner should not have been admitted. Petitioner has raised no point as to correctness of this.
My personal view is that the Chief Justice did not commit error in refusing to let the record be brought up. The petitioner brought up such portions of the record as she thought were necessary to answer the questions presented and respondents stated in effect that they relied on the opinion of the district court of appeal as cited in their brief to support their contention. I think for these and other reasons we have record aplenty to dispose of the case.
I would grant certiorari and quash the judgment of the district court of appeal with directions to reinstate and affirm the judgment of the Circuit Court of Volusia County.
I am authorized to say that Mr. Justice ROBERTS and the Honorable J. FRITZ GORDON, Circuit Judge, concur in this dissent.
ROBERTS, J., and J. FRITZ GORDON, Circuit Judge, concur.