CARSON, Plaintiff-Appellant, v. METROPOLITAN LIFE
INSURANCE COMPANY, Defendant-Appellee.

Ohio Appeals, First District, Hamilton County.

No. 7198.   Decided January 23, 1950.

John A. Kiely, R. Edward Tepe, Cincinnati, for plaintiff-appellant.

Marble & Vordenberg, Cincinnati, for defendant-appellee.

## OPINION

By MATTHEWS, J.:

This is an appeal in an action to recover on provisions for double indemnity in life insurance policies in the event death should result directly and independently of all other causes, of bodily injuries caused solely by external, violent, and accidental means. Upon proof of death, the defendant paid the amount due upon death regardless of the cause, leaving only the issue of whether the death had resulted from external, violent, and accidental means, upon which the liability for the additional sum depends.

At the trial in the common pleas court it developed that

there was no dispute that death of the insured was caused by external and violent means. This left the issue of whether death had resulted from accidental means.

At the close of the plaintiff's evidence, the defendant moved for an instructed verdict, which was granted by the court. Judgment was entered on this verdict and it is from that judgment that this appeal was taken.

There is substantially no dispute as to the data upon which it is necessary to predicate our conclusion as to whether the insured's death resulted from accidental means.

In her brief, the appellant summarizes the evidence as follows:

"James R. Carson was 28 years of age and married, He had two children, a boy of six and a girl five years of age. He had suffered from phlebitis, but had been in good health and had not consulted a physician since Christmas, 1947. He was cheerful and in good spirits. On May 6, 1948, an hour or so before his death, he ate a hearty breakfast of cereal, ham and eggs, and when he left home he promised his little daughter a toy.

"He was the owner and operator of a gasoline service station and auto repair business. There his business was going on as usual and he was his usual cheerful self. Mr. Carson had planned work ahead and had planned a trip over Decoration Day to see his mother. On his arrival there he was jolly with Ballard Lamb, his employee, checked the work to be done and then sent Mr. Lamb after a fan belt for a repair job on hand. Mr. Carson was seated at his desk looking over mail when the helper left the building. Just as Mr. Lamb left the office and was a step from the door, he heard a shot and dashing in, he found Mr. Carson standing, bent over, and holding his chest, with the revolver lying on the floor in front of the desk.

"The revolver, which caused the death, was a 1917 model gun. It would fire if the hammer were struck. It was cutomarily kept in the lower drawer of the desk. On May 5th, however, a city police patrolman, Howard W. Jackson, had come in uniform to Mr. Carson's place of business to work on his own automobile. To give the patrolman a safe place to put his own gun and belt, Mr. Carson had removed his own gun from the bottom drawer and put it in the top drawer. That evening when Patrolman Jackson left Mr. Carson's gun was not replaced, but remained in the top drawer.

"On May 6th, 1948, after Mr. Carson's death his father-in-law found in his automobile the toy he had promised his little girl and another for his little boy."

A reading of the bill of exceptions leads to the conclusion that this is a fair summary of the evidence.

The appellee's summary is much longer. It 'goes more into details, relating to the state of the insured's health and his financial condition. But certainly the evidence would justify the conclusion that the insured was in reasonably good health, and that while he was not very prosperous financially, there was nothing in the condition of his health or his business that would create a spirit of desperation in a normal man. And certainly there is abundant evidence that the insured was in no such mood, but, on the contrary, was cheerful right along up to the last time he was seen just a few seconds before he received the shot from which he died.

The only fact which we would add to appellant's summary of the facts is that these insurance policies were issued on January 8th, 1943, more than five years before insured's death.

The trial court reached the conclusion that "there has not been a single circumstance in this case that would warrant you in finding that this was an accidental death" and, for that reason, the motion for an instructed verdict was sustained.

The fatal wound was inflicted when the insured was alone. When he was last seen prior thereto he was seated in a swivel chair in front of his desk engaged in opening his mail. The revolver was in the desk. No one entered the room before the shot was fired. No one saw the insured with the revolver in his hand or saw him take it from the desk drawer or handle it in any way whatsoever. Still we can conclude with certainty that he did handle it, and that as a result of his handling it, it was discharged and the bullet was caused to pass through his body. We can say that any contrary conclusion would be so unreasonable that reasonable persons would not differ about it. But that is not enough to exclude liability on these policies as a matter of law. To do so, we must go further and draw the conclusion that the insured intended to discharge the revolver and intended to cause the bullet to penetrate the vital organ or organs of his body in order for the evidence to show that the means of his death was not accidental. Of course, if that was what he did and intended, the means would not be accidental, although the result might conceivably be, and, as these policies create liability not on accidental death, but only on death from accidental means, no liability would result. Stated shortly, can we say on the acts and intentions shown by the evidence the insured intended to and did commit suicide?

From the earliest times, suicide has been condemned. The great religions denounce it as immoral, and in early English law the felo de se forfeited his estates and was given an ignominious burial. That attitude toward self-destruction lingers, in a meliorated form in American life today. To hold that the insured committed suicide, we must find that he disregarded this historic interdiction and also the strong instinct for self-preservation that controls most men in the things they do. Without any evidence of what actually happened while the insured was in that room at the time the shot was fired, we do not think we can so hold. There is nothing in the evidence tending to indicate that the insured had formed an intent to commit suicide. An affirmative finding that he intended to kill himself would be unsupported by the evidence. Would a contrary finding be equally lacking in evidential support? We think not.

This question was under consideration in the case of **Mitchell v. Industrial Commission, 135 Oh St, 110.** The widow of a night watchman asked compensation for herself and children on account of the death of her husband in the course of his employment. The night watchman died of a bullet wound inflicted at night while he was alone on the premises. The circumstances indicating accidental death were very meager. The Industrial Commission denied compensation. On appeal, a jury found for the plaintiff and judgment was entered thereon. The Court of Appeals affirmed this judgment. The Supreme Court granted a motion to certify, and, on final hearing, affirmed the judgment. The second paragraph of the syllabus to that case, referring to the presumption against suicide, is:

"Such presumption is in the nature of evidence and operates to its fullest extent only where there is no proof as to whether a death, by external and violent means, was accidental or suicidal."

The Court reviewed the decisions in other jurisdictions on the nature of the presumption against suicide, and, at page 114, quoted with apparent approval from Provident Life & Accident Ins. Co. v. Prieto, 169 Tenn., 124, 83 S. W. (2d.) 251, 103 A. L. R. 191, as follows:

" 'This presumption is not displaced by proof of circumstances which merely tend in a greater or less degree to show suicide, but in such case it is a question for the jury whether they overturn the presumption.' "

At page 115, the Court said:

"In the instant case the evidence before the court showed that the instrument with which the decedent came to his death had been furnished by his employer. It was used by him in his work as a night watchman. There was some evidence of disorder and confusion. There was no motive for suicide shown. Mitchell was found in the building which he was required to watch. With such evidence pointing in the direction of an accidental death, an issue for the jury was presented in the instant case. There was other evidence strongly indicating suicide—the fact that the doors of the building were all locked, that there were four loaded cartridges in the revolver and one empty shell, that the bullet causing the fatal wound came from the same revolver, that the bullet traveled in an almost horizontal direction, and that Mitchell's body was almost under a wash stand where there was a mirror. All of these circumstances, while possessing considerable probative force, nevertheless were not of such a convincing character as to warrant the court taking the issue from the jury."

In **Hassay v. Metropolitan Life Ins. Co., 140 Oh St, 266,** the facts bear no resemblance to the facts in the case at bar, but the same provision of the defendant's policy was the basis of the plaintiff's claim. There was a verdict and judgment for the defendant. This judgment was affirmed. The Court cited Mitchell v. Industrial Commission, supra, with approval, and reiterated the principle of that case in the first paragraph of the syllabus, in which, after declaring that the burden rested upon the plaintiff to prove that death resulted from external, violent, and accidental means, said: "Upon a showing of death by external and violent means, the law raises a presumption that death was accidental, and upon such showing aided by the presumption, a prima facie case for plaintiff is made."

In **Hrybar v. Metropolitan Life Ins. Co., 140 Oh St, 437**— a general verdict was returned for the plaintiff in an action on this same provision in defendant's policy. The court instructed the jury that suicide was an affirmative defense, the burden of proving which was on the defendant. On appeal, the Court of Appeals reversed the judgment for this error and entered final judgment for the defendant, based on its conclusion that the defendant's motion for an instructed verdict should have been sustained. The Supreme Court sustained a motion to certify, and, on final hearing, held with the Court of Appeals as to the burden of proof, but against it as to the ruling on the motion for an instructed verdict. Consequently,

the case was remanded to the Common Pleas Court for further proceedings. In reaching this conclusion the Supreme Court simply applied the principles enunciated by it in Hassay v. Metropolitan Life Ins. Co., supra, which it had decided at the same term of court.

**Brunny, Admx. v. Prudential Ins. Co., 151 Oh St, 86,**—did not involve intentional self-destruction. It related to the presumption of death from absence. The similarity of the presumption against suicide caused the court to comment on such cases including Mitchell v Industrial Commission, supra. The court found that the evidence was so clear and overwhelming that Brunny was still alive that there was no room for the operation of the presumption of death from absence and, therefore, rendered final judgment for defendant. It held that any presumption from absence was completely rebutted, that "reasonable minds could not fairly conclude that the presumption should stand." There is nothing in the case at bar that would require reasonable minds to conclude that the presumption against suicide should not stand.

This same effect of the presumption against suicide was applied in the recent case of **Shepherd v. Midland Mutual Life Ins. Co., 152 Oh St, 6,** the 6th paragraph to the syllabus of which is:

"Where it is shown that death resulted from bodily injury caused by violent and external means, there is a presumption that death did not result from suicide, intentional self-infliction of injury, the criminal assault of another, or other nonaccidental means, but that the death was due to accidental means, in the absence of affirmative proof to the contrary."

For these reasons, we are of the opinion that the plaintiff produced evidence of death by external and violent means and that there was no evidence of nonaccidental means of such a nature as to require the court to conclude as a matter of law that the presumption against intentional self-destruction had been neutralized.

Our conclusion is, that the court erred in sustaining the defendant's motion for an instructed verdict at the close of the plaintiff's evidence, and in entering judgment for it.

The judgment is reversed and the cause remanded for further proceedings according to law.

ROSS, PJ, HILDEBRANT & MATTHEWS, JJ, concur in syllabus, opinion & judgment.