145 So.2d 268 (1962)
WORLD INSURANCE COMPANY, a Corporation, Appellant,
v.
Wanda J. KINCAID, As the Guardian of Danny Stuckey and David Stuckey, Minors, Appellees.
SECURITY LIFE AND TRUST COMPANY, a Corporation, Appellant,
v.
Wanda J. KINCAID, As the Guardian of Danny Stuckey and David Stuckey, Minors, Appellees.
Nos. D-17, D-18.
District Court of Appeal of Florida. First District.
July 10, 1962.
Rehearing Denied October 24, 1962.
Hull, Landis, Graham & French, Daytona Beach, for appellants.
Berrien Becks and Donald Jacobson, Daytona Beach, for appellees.
STURGIS, Judge.
The appellants were defendants in the court below in separate actions on policies of insurance issued by the appellants, respectively, on the life of Ernest Stuckey, who died as the result of a bullet which penetrated his skull at the right temple, being one of two bullets fired one after the other from a pistol held in his hand. Decedent's widow, who is the designated beneficiary of said insurance, has remarried. She has qualified as legal guardian for the appellees in interest, who were born as *269 issue of her marriage to the decedent, and has assigned her rights in said insurance to them. The suits were consolidated for trial and are consolidated for the purposes of this appeal.
The complaint against World Insurance Company, whose policy had been in force less than five months prior to the death of the insured, alleges that by said policy the defendant agreed to pay the face amount of the policy upon death of the insured from accidental bodily injuries, that the insured met his death by accidental means, and that defendant had failed to pay said insurance. This defendant's answer denied that any sum was owing under the policy, and for affirmative defenses alleged (1) that plaintiffs failed to give written notice of the claim as required by the policy, with the result that the defendant had become prejudiced and handicapped in making inquiry into and investigating the events surrounding the death of the insured, and (2) that under the terms of the policy the benefits were payable only if death of the insured resulted "directly and independently of all other causes from accidental bodily injuries," and that he committed suicide.
The policy of Security Life and Trust Company, issued less than two years prior to the death of the insured, contains the following provision:
"Self-Destruction.  Self-destruction on the part of the Insured, whether sane or insane, within two years from the date of this policy is a risk not assumed by the Company under this contract, and the extent of recovery hereunder shall be the premiums actually paid by the insured."
The complaint against Security alleges that the face amount of its policy ($2,500.00) became payable upon the death of the insured, and that certain other benefits, under a "Mortgage Redemption Monthly Decreasing Term Provision," became payable on the death of the insured; that all amounts payable under the policy had matured and become due and payable, but that Security had failed and refused to pay the same. Security's answer denied that any sum of money was due and payable under said policy, and for an affirmative defense alleged that the insured died by self-destruction within less than two years from the date of issuance of said policy, thus excluding recovery thereunder.
Motions of defendants for a directed verdict were made and denied at the close of plaintiffs' evidence and also at the conclusion of all the evidence. The jury returned verdicts for plaintiffs in both cases and defendants moved for a new trial and for entry of judgment notwithstanding the verdicts on grounds which challenged: (a) the sufficiency of the evidence to support the verdicts; (b) the admission in evidence of certain testimony over objection of defendants; (c) the refusal to admit certain evidence proffered by defendants; (d) the giving to the jury of certain charges requested by plaintiffs; and (e) the refusal to give certain charges requested by the defendants. Said motions were denied and final judgments entered on the verdicts, hence this appeal.
Appellants present nine points of law for determination, but the critical issue raised thereby is whether there is sufficient competent evidence to support the verdicts. Closely related issues reach to the question of the admissibility of certain evidence for plaintiffs, to which defendants objected, and to the refusal to admit in evidence certain evidence proffered by defendants.
Plaintiffs' uncontradicted evidence reflects:
On the evening of his death, the insured first visited the Daytona Beach Moose Club where he had a drink, then went to Glen's Hi-Lo Club, a night spot in Ormond Beach (an adjoining municipality) where he had several more drinks. In the meantime his estranged wife, from whom he had been separated for approximately six *270 months, had without his knowledge gone with friends to a night spot in Daytona Beach known as the Derby Bar, where she remained for several hours and then went to Glen's Hi-Lo Club. While there she and her husband saw but did not speak to one another. Stuckey left that establishment and proceeded to another night spot, the True-Vue Grill Restaurant at Daytona Beach, arriving there after midnight, where he encountered one Jack Lynady, an acquaintance whose occupation was that of a deputy sheriff of Volusia County and an investigator for the local State Attorney's office. Stuckey tried to persuade officer Lynady to go with him to Glen's Hi-Lo Club to see his wife there dancing with some other man, but Lynady refused to do so. He passed some time there and, after engaging in a bit of horseplay with officer Lynady outside the tavern, proceeded to his wife's place of residence. Upon arrival there he had a conversation with his mother-in-law, went to a bedroom, locked the door, and deliberately, according to appellants' contention, or accidentally, according to appellees', mortally shot himself in the right temple with one of two bullets fired from his revolver. The other bullet lodged in the ceiling of the room. When the shots were fired his mother-in-law was en route to the home of a next-door neighbor. These things happened within less than thirty minutes after he left officer Lynady's company at the True-Vue Grill Restaurant.
Representatives of the Daytona Beach Police Department and of the Volusia County Sheriff's Office, including deputy sheriff Lynady, arrived on the scene within a few minutes after the shooting. Also among the early arrivals was J.C. Beard, a brother of Mr. Stuckey's widow, who was justice of the peace and coroner for the justice's district in which the tragedy occurred. The police broke down the door in order to gain admittance to the bedroom where they found the insured lying dead on the floor. Decedent's widow arrived later, became hysterical, and was taken to a hospital for sedation.
Officer Jack Lynady, who became the principal witness for plaintiffs, testified that twenty to twenty-five minutes elapsed between the time he last saw Stuckey at the True-Vue Grill Restraurant and the time when he saw his body in the bedroom; that after Stuckey left the restaurant a police lieutenant (Carr) drove up and engaged Lynady in a conversation that lasted fifteen minutes; that they each then drove their cars to the Daytona Beach police station. He gave the following significant testimony concerning his action during the next few minutes and the causes prompting it:
"As we arrived in front of the police station the radio operator stepped outside and shouted for Lieutenant's car to go to Colfax Avenue, that a woman was having trouble with her son-in-law and I live on Berkshire Road, which is west of Colfax, and I said, `Go ahead, I will follow you.' And, `If you need help, I will help you.' And that's what I did, I followed the man out there."
Officer Lynady, Lieutenant Carr, and another police officer (Vitale) made an initial investigation immediately upon arriving at the scene. They found the body lying on its back adjacent to a bed. Stuckey's pistol was lying by his left knee. Two bullets had been fired from the pistol, one of which lodged in the ceiling and the other entered Stuckey's right temple. Lynady looked for but did not find any powder burns on the corpse in the area of the temple. On the following day he again examined the scene and near a bed observed a chip in the terrazzo floor of the bedroom, a factor that will be discussed later.
Coroner Beard officially pronounced the death as "suicide" by "self-inflicted gunshot wound", and a death certificate to that effect was filed with the Florida State Board of Health, Bureau of Vital Statistics. More than a year later a coroner's jury was *271 impaneled by Coroner Beard to inquire into the death of the insured and, although it did not view his body, rendered a verdict that his death resulted from "gunshot wounds by accident or mischance." Coroner Beard then filed with the State Board of Health an affidavit purporting to correct the death certificate by changing the original references therein, indicating death by suicide, so as to reflect death by accident or mischance according to the verdict of the coroner's jury. These suits were subsequently filed.
The benefits provided by the World Insurance Company policy are made to accrue only in the event of accidental death of the insured. The burden of proof rested on the plaintiffs to establish that death was caused (a) by accidental means and (b) under circumstances not falling within the exclusionary provisions, if any, of the policy. In Anderson v. New York Life Ins. Co., 140 Fla. 198, 191 So. 307, which was a suit on the double indemnity feature of a life insurance policy, the claim was cast on the theory of accidental death. There were two pleas, one denying accidental death and the other offering suicide as a defense. The insured was found dead in a latrine at the back of his residence with a bullet through his head and a pistol by his feet. In affirming a directed verdict for the defendant at the close of plaintiff's testimony, the Florida Supreme Court said:
"The burden was first on the plaintiff to prove that the deceased came to his death by accidental means, this being her reliance for recovery. The defense of suicide must overcome this proof and may not come into the picture if a prima facie case on the basis of accidental death is not made. * * * A prima facie case not having been made on the ground claimed, the burden did not shift to the defendant to overcome that case with evidence on the defense of suicide."
Applying that rule to the facts in the cases on appeal, and after careful consideration of the hereinafter discussed testimony given by deputy sheriff Jack Lynady, appearing in the role of an expert witness for plaintiffs, we hold that the trial court erred in denying the motion of World Insurance Company for a directed verdict, and also erred in denying its post-verdict motion for judgment n.o.v.
We are not unmindful that a prima facie presumption against suicide attends an unexplained death. Mutual Life Ins. Co. of New York v. Johnson, 122 Fla. 567, 166 So. 442. However, the presumption against suicide abides only until creditable evidence of suicide appears from the evidence adduced by either party to the action. At that point the presumption vanishes and the cause thereafter proceeds to determination on the issues in the usual manner. See Mutual Life Ins. Co. of New York v. Bell, 147 Fla. 734, 3 So.2d 487, which was an action to recover on a double indemnity provision of a life insurance policy whereby the insurer was obligated to pay the extra benefits in the event death "resulted from bodily injury effected solely through external, violent and accidental means * *." The defendant insurer filed but later withdrew a plea alleging death by suicide. A verdict for plaintiff was affirmed. Mr. Justice Adams, speaking for the Florida Supreme Court, in the main opinion used language indicating that where the defense of death by suicide is not interposed, the insurer may not have the benefit of evidence produced by plaintiff from which a reasonable inference of death by suicide could be drawn. On rehearing, however, the court rendered a per curiam opinion holding that the defendant insurer was entitled to the benefit "of any evidence in its favor that was adduced at the trial by either party," and we adhere to that rule in arriving at our conclusions in the cases now on appeal.
The action against Security Life and Trust Company was based on straight life features of its policy. In the suit on that policy the plaintiffs might have made out a prima facie case by simply establishing *272 death of the insured during the life of the policy, and had plaintiffs' evidence in chief been so limited, the burden would have shifted to the defendant to establish its affirmative defense that the insured met death by suicide within two years from the issuance of the policy. However, plaintiffs' evidence in chief, standing alone, is susceptible of no reasonable conclusion other than that the insured committed suicide; and said defendant, under the rule in Mutual Life Ins. Co. of New York v. Bell, supra, is entitled to the benefit of that evidence. The hereinafter discussed testimony of plaintiffs' witness Jack Lynady, on whom plaintiffs rely to support their claims, is insufficient in law and in fact to overcome the overwhelming weight of the positive testimony of this and other witnesses producing the inescapable conclusion of death by suicide. The testimony produced by defendants in rebuttal of plaintiffs' evidence in chief served only to emphasize and implement the credible testimony theretofore produced by plaintiffs, the conclusive effect of which was to establish that the insured committed suicide. Applying the rule announced by the Florida Supreme Court in Mutual Life Ins. Co. of New York v. Bell, supra, to the facts in this case, we hold that the trial court erred in denying the motion of Security Life and Trust Company for a directed verdict.
While it is the sole province of the jury to decide issues of fact, its verdict cannot stand if it is based on evidence that is essentially illegal, contrary to natural laws, opposed to common knowledge, or clearly inconsistent with other circumstances. See Catlett v. Chestnut, 107 Fla. 498, 146 So. 241, 91 A.L.R. 212. As said in Florida Power Corporation v. Willis (Fla.App.), 112 So.2d 15:
"It is a sound rule that when physical situations or matters of common knowledge point so certainly to the truth as to leave no room for a contrary determination, based on reason and common sense, such physical situation and reasonable probabilities are not affected by sworn testimony which, in mere words, conflicts therewith."
Witness Lynady had substantial training in police work. He was repeatedly referred to by plaintiffs' counsel as an "expert" witness, and rulings of the trial judge on defendants' objections to evidence elicited from him indicate that the court considered him qualified as an expert, though upon what specialty the record does not disclose. After a series of questions and answers that were apparently designed to qualify him as an expert, apparently as an investigator of crimes, one who had experience in investigating the causes of homicide, had studied a book by Dr. Schneider entitled "Homicidal Investigation", Lynady was asked a question which elicited the response that he did not find any powder burns on the body of the insured. Thereupon the following colloquy took place:
"Q. [by Mr. Becks, counsel for plaintiffs] What would that have indicated to you?
"A. That the gun would have been fired either on contact or within eighteen inches from his head.
"Q. In other words, then he could have fired the gun?
"A. From eighteen inches, yes sir, or more.
"Q. Did it indicate to you that since you didn't see any powder burns that Ernie didn't fire the gun into his head like this?
"A. That's the reason 
"MR. FRENCH [counsel for defendants]; I object to the question on the ground it calls for a conclusion of the witness.
"THE COURT: The Court has ruled he can qualify as an expert.

*273 "MR. BECKS: Your Honor, this man is an expert and we have so qualified him. And certainly he has the right to give his opinion as any other expert witness, after surveying the facts.
"THE COURT: The Court has ruled he can qualify as an expert.
"Q. [by Mr. Becks] Would you describe to the jury what kind of floor that is in the room where Ernie lay?
"A. That is a stone terrazzo floor.
"Q. Officer, in making your investigation did you look at the floor in this room?
"A. Yes, sir, I did.
"Q. Will you tell the jury what you found?
"A. Mr. Becks, of course, this investigation of the floor was made on the following day. I made the investigation in the morgue the night before after leaving the house and the next morning I went back to the house and at that time I found that near the bed  may I have that other photograph  (Receives photograph from Mr. Becks) near the bed, in this area right here on the floor a spot for instance that would be between the legs, about the center of the feet  you understand what I mean  a man sitting on the bed here. The mark on the floor was about the right center of his legs and there was a chip out of the terrazzo floor, actually.
"Q. And did you determine what caused that chip, also?
"A. I determined that it was from the pistol, from a shot of the pistol.
"Q. And did you determine where that slug went after it left the floor?
"A. Into Mr. Stuckey's head."
[We here interpolate that the record is devoid of any testimony indicating by theory, fact, or reasonable probability from the known facts, the path which the supposed bullet took after it supposedly struck the terrazzo floor upon being supposedly fired between the legs of the insured while he was supposedly sitting on the bed.]
After some further testimony the following colloquy occurred:
"Q. [by Mr. Becks] Mr. Lynady, during your investigation of this case and a study of the facts, based on your experience as a police officer and the various things you have discussed, do you have an opinion as to whether or not Ernie Stuckey committed suicide?
"MR. FRENCH: I object to the question on the following grounds: It calls for a conclusion of the witness on the very matter in question in this case, invades the province of the jury, and it is incompetent and improper.
"THE COURT: Objection overruled. Answer the question, if you can.
"A. It is my opinion, Mr. Becks, that Ernest Stuckey did not commit suicide. Ernest Stuckey was shot in the head by this ricocheting bullet, off the terrazzo floor. I determined, not only from the type of wound, but the fact that there wasn't any powder burns on his head, but also the fact that the trajectory of the bullet indicates that a man would have to be standing on his head to be shot the way he was. That is my opinion.
* * * * * *
"Q. Mr. Lynady, do you have an opinion as to which shot actually killed the deceased?
"MR. FRENCH: I object on the grounds that it calls for a conclusion of the witness and speculation.
"MR. BECKS: Your Honor, this is the very job that this officer does every day. He has qualified for it and certainly *274 he has the right to give his opinion.
"THE COURT: Objection overruled. Answer the question, if you can.
"A. It is my opinion that he was struck on the head by the first shot and in turning and falling off of the bed on to the floor, pulled the trigger, and in semi-death he pulled the trigger and fired the shot into the ceiling.
"Q. Mr. Lynady, do you have an opinion as to where he was when he pulled this first shot?
"MR. FRENCH: I object on the grounds it calls for speculation and conclusion.
"THE COURT: Objection overruled. Answer the question, if you can.
"A. It is my opinion, after making my investigation, that he was sitting on the bed and shot the gun into the floor and in doing so, placed his head in the position where he would get that ricocheting bullet downward from him. That is my opinion.
"Q. And then he fell off the bed with the gun in his hand and gave the second one?
"A. Yes, sir."
There is no evidence whatever to support the conclusion of the witness that the insured sat on the bed at any time, much less the other conclusions stated by the witness. Indeed, the testimony of witness Lynady is fraught with inference upon inference drawn from pure speculation and conjecture, and is replete with prejudicial expressions of opinion as to factual matters which, even assuming that all the evidence given by him was admissible, it is the province of the jury alone to determine. No useful purpose would be served by itemizing each objectionable item. Suffice it to say that the above quoted objections to his testimony were sound, and it was prejudicial error to overrule them.
In regard to the chip in the terrazzo floor, the existence of which provided the basis upon which Lynady theorized that Stuckey fired his pistol into the floor, and theorized that the bullet from that shot ricocheted and entered Stuckey's right temple, killing him, the following colloquy occurred on cross-examination:
"Q. [by Mr. French, counsel for defendants] Now, back on that chip in the floor, terrazzo floor  that's a cement floor isn't it  that is a cement base with chips of marble in it  with the consistency of cement, that's hard, isn't it?
"A. Oh, yes, very hard.
"Q. It chips fairly easily, doesn't it?
"A. I don't know. Chips fairly easily? I don't know.
"Q. Well, you have seen chips in terrazzo floors that weren't caused by bullets, haven't you?
"A. I don't recall them, I might have.
"Q. Well, you don't actually know what caused this chip, do you?
"A. No sir, I don't.
"Q. It's conjecture or speculation on your part. You were just looking around and you saw that there, so you concluded that that might have been from a bullet, is that right?
"A. No, I didn't conclude by myself, I inquired of the woman who lived in the house. I knew the house was a comparatively new home and when I saw the chip it stood out. There weren't any other chips on the floor, and I asked her what had happened, where this hole in the floor had come from. And she said, `I never saw it before.' So, I concluded then *275 that possibly that is where it came from. (Emphasis supplied)
"Q. Well, of course, it would be perfectly possible that she might not have seen it before and it might have been caused by something else?
"A. Yes."
The ice of this witness's testimony is too thin for reasonable men to skate on.
Appellants question the admissibility in evidence of the affidavit of Coroner Beard as part of the death certificate offered by plaintiffs. It will be recalled that the affidavit purports to conform the cause of death to "gunshot wound by accident or mischance" according to the belated verdict of the coroner's jury. Appellees rely on Section 382.35(6), Florida Statutes, F.S.A., which provides:
"Any copy of any record registered under the provisions of this act or any part thereof when properly certified by the state registrar shall be prima facie evidence in all courts and cases of the facts therein stated."
The prevailing rule in Florida and elsewhere is that the coroner's finding or verdict is not admissible in an insurance action on the issue of suicide. Mutual Life Ins. Co. of New York v. Bell, supra; Carson v. Metropolitan Life Ins. Co. (1951), 156 Ohio St. 104, 100 N.E.2d 197, 28 A.L.R.2d 344; Anno. 28 A.L.R.2d 352.
In the Carson case, supra, the issue, as in the cases on appeal, was whether the insured died of bodily injuries caused solely by accidental means and not as a result of self-destruction. Carson had been in financial difficulties but on the morning of his death was cheerful when he left his home. The last person to see him alive was an employee of his father-in-law, at which time Carson was in his office opening and reading his mail. When this witness had made three or four steps outside the office door, he heard a shot and immediately re-entered the office where he found Carson had been shot through the left chest with his own revolver, the bullet traveling practically straight through his chest. He never spoke again and died shortly thereafter at the hospital. The jury returned a verdict for the defendant, judgment was entered thereon and was affirmed by the Ohio Court of Appeals. 87 Ohio App. 53, 93 N.E.2d 717. The cause was then reviewed by the Ohio Supreme Court and reversed. There were three grounds of error, each of which finds a substantial counterpart in the cases now on review:
First. Error was assigned to the refusal of the trial court to instruct the jury that if it found from the preponderance of the evidence that the insured "met his death by external and violent means, under circumstances not wholly inconsistent with accident, the law raises a presumption of accidental death, and that presumption remains until overcome by evidence to the contrary." The Ohio Supreme Court recognized the rule that in case of death by external and violent means there is a presumption against suicide, but held that it is misleading to charge the jury that the presumption remains until overcome by evidence to the contrary, for the reason that the jury could be led to believe that the evidence to overcome the presumption must have a greater weight than the presumption itself, saying:
"The presumption is a rebuttable one and disappears upon the production of evidence to the contrary, which counterbalances it or leaves the case in equipoise. Brunny, Adm'x, v. Prudential Ins. Co. of America, 151 Ohio St. 86, 84 N.E.2d 504.
"Then, too, the requested charge, referring to death by external and violent means as raising a presumption of accidental death, rather than a death by accidental means as required by the terms of the insurance policies, is open to the argument that the charge is merely abstract rather than one applicable to the issue in the present case."
*276 Second. Error was assigned to the giving of the following special charge requested by defendant insurer:
"The court instructs the jury that the burden is upon the plaintiff to prove by a preponderance, or the greater weight of the evidence, that the death of the insured occurred as the result, directly and independently of all other causes of accidental means, and that said death did not occur as the result of suicide or self-destruction, while sane or insane, and should you find that plaintiff has failed to sustain that burden by a preponderance of the evidence, then your verdict must be for the defendant company. The burden never shifts, and although the defendant alleges in its amended answer that the insured's death resulted from self-destruction there is no burden upon it to prove that fact; instead, the burden of proof remains with the plaintiff to establish by a preponderance of the evidence that death did not result from self-destruction."
Holding that said charge as given was not erroneous as applied to the facts in that case, the Ohio Supreme Court said:
"It is true that plaintiff has the benefit of the presumption against suicide but where, as in this case, there is evidence to counterbalance or overthrow that presumption plaintiff must show by a preponderance of the evidence, of which the presumption in her behalf is a part, that the insured did not die as a result of suicide."
We recognize that the rule there stated is applicable only to the suit against appellant World Insurance Company involved on this appeal, and does not apply to the suit against the other appellant.
Third. Error was assigned in Carson to the admission in evidence, over objections of plaintiff, of the coroner's report and certified copies of the death certificate, all containing the statement that the cause of the insured's death was suicide; also containing statements referring to his color, age, sex, marital status, occupation, and that the injuries causing death consisted of a penetrating gunshot wound of the chest or thorax. The insurer contended that the exhibits were admissible under the following sections of the Ohio Code, which find substantial counterparts in Sections 382.10, 382.20, and 382.35(6), Florida Statutes, F.S.A.:
"The records of the coroner, made by himself or by anyone acting under his direction or supervision shall be considered public records, and such records or transcripts thereof, or photostatic copies thereof, certified by the coroner, shall be received as evidence in any criminal or civil court in this state, as to the facts therein contained." Sec. 2855-11, General Code, Ohio.
"Official reports made by officers of this state, or certified copies of the same, on a matter within the scope of their duty as defined by statute, shall, in so far as relevant, be admitted as evidence of the matters stated therein." Sec. 12102-26, General Code, Ohio.
"The director of health, or person authorized by him, shall upon request * * * supply to any applicant a certified copy of the original certificate of any birth, death, or stillbirth, registered according to law. Such certified copy of such original certificate * * * shall be prima facie evidence in all courts and places of the facts therein stated." Sec. 1261-66, General Code, Ohio.
The Ohio Supreme Court held, and we agree, that under said statutes the exhibits in question were admissible as to the facts stated therein concerning the age of the insured, his color, sex, that he had the gunshot wound described therein, and other demonstrable facts. But upon the question as to whether the statement in the exhibits *277 that the insured was a suicide constitutes a statement of fact or simply an opinion or conclusion based upon the ascertained facts, the court held that in the absence of any direct testimony as to suicide, an expression by a coroner or physician that a decedent committed suicide is a mere opinion and does not constitute a fact as contemplated by the provisions of said statutes and that the admission of such opinions was prejudicial.
The same considerations as in Carson apply in the cases on appeal to the admission in evidence of so much of the Stuckey death certificate, as supplemented or amended by the subsequent affidavit of the coroner, which purports to state as a fact the finding of the coroner's jury that the insured met his death by accident or mischance, and apply with equal force to the improper admission in evidence of the opinion of the witness Lynady that the insured met death by accident and did not commit suicide.
We subscribe fully to the views expressed in Carson v. Metropolitan Life Ins. Co., supra. It will be noted that in Carson the appellant did not assign error on any ground challenging the evidentiary basis of the verdict for the insurer. The decision therefore has no bearing on the challenge addressed by the appellant insurers in the cases on appeal to the sufficiency of the evidence to support the verdicts, except to the extent that upon applying the principles expressed in Carson to the evidence herein, as we have held is proper, the inevitable result is a failure of the plaintiffs to meet the burden of proof imposed upon them.
In Mutual Life Ins. Co. of New York v. Bell, supra, the double-barrel shotgun of the insured, who had recently been killed by gunshot which had entered at or near his left nipple and ranged directly into his body, was found near the body of the insured in his yard. There was no evidence of a struggle or fight. The gun had one empty shell and one loaded with both hammers down. He had been in normal health and had no financial or domestic problems. A coroner's jury found that death was caused by a self-inflicted shotgun wound and the insurer sought to have it admitted in evidence in proof of death by suicide. In sustaining the refusal of the trial court to admit it, the Florida Supreme Court pointed out that a third party has no absolute right in law to be present at or participate in an inquest, hence it would be wrong in principle to receive in evidence a verdict against a party who had not had an opportunity to participate in its findings. The court restated the rule in Mutual Life Ins. Co. of New York v. Johnson, supra, holding that a presumption against suicide prevails when the cause of death is unknown, but went on to say:
"It is true if there had been evidence of suicide the presumption would have vanished. The defense [in Bell] was not suicide. Had such a defense been interposed with sustaining proof the presumption would have vanished. In this case the defendant merely put plaintiff to proof of her case." (Emphasis supplied)
As previously stated, in Bell the court went on to hold that the defendant is entitled to the benefit of any evidence in its favor adduced at the trial by either party. There is nothing novel about this rule of law and we have applied it in concluding that the overwhelming weight of the competent material evidence in the cases on appeal, taken as a whole, affords no basis for any conclusion other than that the insured committed suicide.
Further discussion of the assignments of error serve no useful purpose. The judgments appealed are severally reversed and the trial court is directed to enter appropriate judgments non obstante veredicto for the respective parties defendant in accordance with their respective motions.
Reversed and remanded with directions.
CARROLL, DONALD K., C.J., and RAWLS, J., concur.